**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| DIETGOAL INNOVATIONS LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:11-cv-00418-MHS-RSP |
| | ) | |
| ARBY'S RESTAURANT GROUP, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' NOTICE OF AUTHORITY REGARDING FINDING OF**
**INVALIDITY OF ASSERTED PATENT PURSUANT TO 35 U.S.C. § 101**

Defendants Arby's Restaurant Group, Inc.; Darden Corporation; Moe's Franchisor LLC;

Wendy's International, Inc.; Culver Franchising System, Inc.; International Dairy Queen, Inc.;

McDonald's Corporation; Jack in the Box Inc.; and Rubio's Restaurants, Inc. (collectively, "the

Alston & Bird Defendants") hereby notify the Court that on July 8, 2014, the United States

District Court for the Southern District of New York issued an Opinion and Order in *DietGoal*

*Innovations LLC v. Bravo Media LLC*, Case No. 1:13-cv-8391-PAE, holding that the only patent

asserted against the defendants in this case, U.S. Patent No. 6,585,516 ("the '516 Patent") was

directed to patent ineligible subject matter and was therefore invalid under 35 U.S.C. § 101.  A

true and accurate copy of this decision is attached hereto as Exhibit A (D.E. 148).

Dated:  July 9, 2014                          Respectfully submitted,

                                             */s/ Holly Hawkins Saporito*
                                             Robert L. Lee (Georgia Bar No. 443978)
                                             bob.lee@alston.com
                                             Holly Hawkins Saporito (Georgia Bar No. 142496)
                                             holly.saporito@alston.com
                                             ALSTON & BIRD LLP
                                             One Atlantic Center

1201 West Peachtree Street
Atlanta, GA  30309-3424
Telephone:  404-881-7000
Fax:  404-881-7777

Derek S. Neilson
State Bar No. 24072255
derek.neilson@alston.com
Jason W. Cook
State Bar No. 24028537
jason.cook@alston.com
ALSTON & BIRD LLP
2828 North Harwood St., Suite 1800
Dallas, TX  75201-2139
Telephone:  (214) 922-3400
Fax:  (214) 922-3899

*Attorneys for Arby's Restaurant Group, Inc.;*
*Culver Franchising System, Inc.;*
*International Dairy Queen, Inc.;*
*Jack in the Box Inc.; McDonald's Corporation;*
*Wendy's International, Inc.; Darden Corporation;*
*Moe's Franchisor, LLC; Rubio's Restaurants, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of July 2014, a true and correct copy of the foregoing

document was served upon all counsel of record who are deemed to have consented to electronic

service via the Court's CM/ECF System per Local Rule CV-5(a).

By:   */s/ Holly Hawkins Saporito*
          Holly Hawkins Saporito

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                            :

DIETGOAL INNOVATIONS LLC,                    :

                                              :            13 Civ. 8391 (PAE)
                             Plaintiff,      :

                                              :          OPINION & ORDER

                -v-                        :

                                              :

BRAVO MEDIA LLC (DIVISION OF NBC    :
UNIVERSAL MEDIA, LLC),                 :

                                              :

                                Defendant.     :

                                              :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

        This is one of several patent-infringement actions brought by Plaintiff DietGoal

Innovations LLC ("DietGoal") against various defendants, concerning alleged infringement on

DietGoal's '516 Patent, which claims a computerized method and system for diet-related

behavior analysis, training, and planning.  Before the Court now are two motions for summary

judgment filed by defendant Bravo Media LLC ("Bravo"): one on the ground that the '516

Patent is drawn to patent-ineligible subject matter, and thus is invalid under § 101 of the Patent

Act, 35 U.S.C. § 101; and the other on the ground that Bravo did not infringe on the '516 patent.

For the reasons that follow, the '516 patent claims the abstract idea of meal planning, and thus is

invalid under § 101.  Bravo's motion for summary judgment on that ground is, therefore,

granted.

I.      **Background**[1]

        A.      **The Parties**

        DietGoal is a limited liability company based in Austin, Texas, which, *inter alia*, buys

and holds the rights to patents.  Am. Compl. ¶ 1.  Relevant here, DietGoal "is the exclusive

licensee of the '516 patent and possesses all rights to sue for and recover all past, present and

future damages for infringement of the '516 patent."  *Id.* ¶ 8.

        Bravo is a division of NBC Universal, a media company incorporated under the laws of

Delaware, with its principal place of business in New York.  *Id.* ¶ 2.  Bravo operates a television

station by the same name, which features original programming, including cooking competition

shows such as "Top Chef."  Bravo also operates a website, http://www.bravotv.com, which at

one time contained a user interface that allowed visitors to search for recipes featured on Bravo

television shows, http://bravotv.com/foodies/recipes.  *See* Bravo § 112 56.1 ¶ 21.

        B.      **The '516 Patent**

        U.S. Patent No. 6,585,516, entitled "Method and System for Computerized Visual

Behavior Analysis, Training, and Planning," was originally issued by the U.S. Patent and

Trademark Office (the "PTO") to inventor Oliver Alabaster on July 1, 2003.  Dkt. 130 Ex. 1 (the

"'516 Patent").  The '516 Patent claims "[a] system and method for computerized visual

behavior analysis, training, and planning," for the purpose of modifying diet behavior.  As

---

[1] In ruling on these motions for summary judgment, which could equally validly have been styled
motions for judgment on the pleadings, the Court considered: the Amended Complaint (Dkt.
111) ("Am. Compl."); Defendant Bravo Media LLC's Local Civil Rule 56.1 Statement in
Support of its Motion for Summary Judgment of Non-Infringement and Invalidity under 35
U.S.C. § 112 (Dkt. 124) ("Bravo § 112 56.1"); Defendant Bravo Media LLC's Local Civil Rule
56.1 Statement in Support of its Motion for Summary Judgment of Non-Infringement and
Invalidity under 35 U.S.C. § 101 (Dkt. 129) ("Bravo § 101 56.1"); Plaintiff's Opposition to
Defendant's Statement of Material Facts Pursuant to Local Rule 56.1 (Dkt. 134) ("DietGoal 56.1
Opp."); and other documents as cited.

originally issued, the '516 Patent recited four independent claims (Claims 1, 2, 12, and 13) and

14 dependent claims (Claims 3–11 and 14–18).  *See id.*; *see also* Bravo § 112 56.1 ¶¶ 2, 3.  On

October 2, 2013, the PTO issued a reexamination certificate for the '516 Patent, which

confirmed the patentability of Claims 1–18 of the '516 Patent and added new Claims 19–61.[2]

*See* '516 Patent; Bravo § 112 56.1 ¶ 20.

Specifically, the system claims (Claims 1 and 2) of the '516 Patent disclose:

1. A system of computerized meal planning, comprising:
a User Interface;
a Database of food objects organizable into meals; and
at least one Picture Menus, which displays on the User Interface meals from the
Database that a user can select from to meet customized eating goal.

2. A system of computerized meal planning, comprising:
a User Interface;
a Database of food objects; and
a Meal Builder, which displays on the User Interface meals from the Database,
and wherein a user can change content of said meals and view the resulting meals'
impact on customized eating goals.

The "summary of the invention" portion of the '516 Patent elaborates that the system

"include[s] a User Interface (UI), a Meal Database, a Food Database, Picture Menus, and a Meal

Builder."  The User Interface can "receive commands from the user and display results to the

user from the Picture Menus and Meal Builder."  The Meal and Food Databases contain "pre-set

meals comprising combinations of foods that conform to predetermined characteristics," which

can be modified according to the user's preferences and tendencies.  The Picture Menus, which

"display on the User Interface meals from the Database," allow the user to "mix and match

[meals to] meet customized eating goals."  Then, using the Meal Builder, users can "change

[those meals] and view the meals' impact on customized eating goals."  In other words, the Meal

---

[2] The reexamination certificate lists Oliver Alabaster as inventor and DietGoal as assignee of the '516 Patent.  *See id.*

3

Builder "can be a scoring system that allows the user to view, in real time, the impact of food

choices on customized eating goals, and the accumulated impact on daily nutrition allowance

made by saved meals and snacks throughout the day."

> The method claims (Claims 12 and 13) disclose:
>
> 12. A method of computerized planning that can influence behavior, comprising:
> preparing a Database of food objects;
> allowing a user to choose meals from one or more Picture Menus, which display
> on a User Interface meals comprised from the food objects from the Database that
> the user can mix and match to meet customized eating goals, for a particular
> amount of time; and
> allowing a user to save the meals.
>
> 13. A method of computerized planning that can influence behavior, comprising:
> preparing a Database of food objects;
> allowing the user to decide whether or not to change one or more meals comprising
> food objects; and
> if the user decides to change one or more of the meals, allowing the user to change
> the meals using a Meal Builder, which displays on the User Interface the food
> objects from the meals from the Database, corresponding to the Picture Menus,
> where the user can change and view the meals' impact on customized eating goals.

The "method" of computerized meal planning, as elaborated in the Patent, "can include

the following steps": "First, the Meal Database and Food Database can be prepared. Second, the

user can choose meals for a particular day. Third, the user can decide whether or not to change

one or more of the meals he has chosen for the particular day. If the user decides to change his

chosen meals, the user can edit or create new meals using the Meal Builder. If the user decides

not to change his choices, or after the user changes his choices, the user can save the meals for

the particular day."

## C.  Procedural History

On June 13, 2012, DietGoal commenced this action in the Eastern District of Texas. Dkt.

1. It alleged that Bravo infringed on one or more claims of the '516 Patent, as well as on one or

more claims in the reexamination certificate relating to the '516 Patent, in violation of 35 U.S.C.

§ 271, by making and/or using a computerized meal planning interface and meal builder function on its website, http://bravotv.com/foodies/recipes. *See id.* At the time, this was one of more than 22 cases that DietGoal had filed in five districts alleging infringement of the '516 Patent.

On September 17, 2012, Bravo moved to transfer this action to this District. Dkt. 20. On April 9, 2013, the action was transferred instead to the Eastern District of Virginia. Dkt. 62. On May 2, 2013, Bravo again moved to transfer to this District, Dkt. 67; the motion was granted on November 19, 2013, Dkt. 92. On January 22, 2014, this Court held an initial pretrial conference and entered a civil case management plan and scheduling order. Dkt. 109. On January 31, 2014, DietGoal filed an Amended Complaint. Dkt. 111 ("Am. Compl."). On February 3, 2014, Bravo filed an Amended Answer and Counterclaims to include defenses that arose as a result of reexamination while the case was stayed in Virginia—namely, inequitable conduct and patent misuse. Dkt. 112. On February 19, 2014, the Panel on Multidistrict Litigation denied the motion to centralize the various pending actions into a single litigation. Dkt. 113.

On February 25, 2014, the Court granted Bravo's request to file two separate summary judgment motions on two discrete grounds: one on the ground of non-infringement, *i.e.*, that the '516 Patent cannot be construed to encompass a system in which the user's computer accesses the database of "food objects" via a network such as the Internet, and thus Bravo's website could not have infringed; and the other on the ground of invalidity, *i.e.*, that the '516 Patent is drawn to patent-ineligible subject matter under § 101 of the Patent Act because it claims an "abstract idea" or "mental concept." Dkt. 117.

On March 7, 2014, Bravo moved for summary judgment on the ground of non-infringement, Dkt. 120, and filed a supporting memorandum of law, Dkt. 121 ("Bravo § 112 Br."). On May 19, 2014, Bravo moved for summary judgment on the ground of patent

invalidity, Dkt. 127, and filed a supporting memorandum of law, Dkt. 128 ("Bravo § 101 Br.").

On March 24, 2014, DietGoal filed its memorandum of law opposing Bravo's first motion. Dkt.

131 ("DietGoal § 112 Br."). On April 8, 2014, DietGoal filed its memorandum of law opposing

Bravo's second motion. Dkt. 139 ("DietGoal § 101 Br."). On April 3 and 16, 2014,

respectively, Bravo submitted its reply memoranda. Dkt. 135, 141. On May 20, 2014, the Court

held argument.

## II.     Applicable Legal Standards

To prevail on a motion for summary judgment, the movant must "show[] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a

question of material fact. In making this determination, the Court must view all facts "in the

light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d

Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To survive a summary judgment motion, the opposing party must establish a genuine

issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1);

*see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere

speculation or conjecture as to the true nature of the facts to overcome a motion for summary

judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes

over "facts that might affect the outcome of the suit under the governing law" will preclude a

grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In

determining whether there are genuine issues of material fact, the Court is "required to resolve

all ambiguities and draw all permissible factual inferences in favor of the party against whom

summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III. Discussion

In its summary judgment motions, Bravo argues that the '516 Patent is invalid under § 101 of the Patent Act because its claims are drawn to patent-ineligible subject matter; and that even if the '516 Patent is valid under § 101, Bravo did not infringe, because the Patent, properly construed, does not cover network-based systems such as Bravo's. The Court agrees that the '516 Patent claims an abstract idea or mental concept, and thus is invalid under § 101. Accordingly, the Court need not reach Bravo's alternative ground for summary judgment.

### A. Section 101 of the Patent Act

"Whether a claim is drawn to patent-eligible subject matter under § 101 is a threshold inquiry[.]" *In re Bilski*, 545 F.3d 943, 950 (Fed. Cir. 2008) ("*Bilski I*"), *affirmed by Bilski v. Kappos*, 561 U.S. 593, 130 S. Ct. 3218 (2010) ("*Bilski II*"). If a claim is not drawn to patent-eligible subject matter, it "must be rejected even if it meets all of the other legal requirements of patentability." *Id*. The determination of whether a claim is drawn to patent-eligible subject matter is a "pure question of law." *Lumen View Tech. v. Findthebest.com, Inc.*, 984 F. Supp. 2d 189, 204 (S.D.N.Y. 2013); *see also Bilski I*, 545 F.3d at 951 (patent validity under § 101 is an "issue of law"). Under the Patent Act, all patents are "presumed valid," and "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) [is] presumed valid independently of the validity of other claims." 35 U.S.C. § 282(a). "The party challenging the validity of a patent bears the burden of proving invalidity by clear and convincing evidence." *Lumen View*, 984 F. Supp. 2d at 194; *see also* 35 U.S.C. § 282(a) ("The burden of establishing invalidity of a patent or any claim thereof . . . rest[s] on the party asserting such invalidity.").

Section 101 defines the categories of inventions eligible for patent protection. It provides:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

35 U.S.C. § 101. Section 101 thus "recites four categories of patent-eligible subject matter: processes, machines, manufactures, and compositions of matter." *Bilski I*, 545 F.3d at 951. The Supreme Court has long held that there are "three specific exceptions to § 101's broad patent-eligibility principles: 'laws of nature, physical phenomena, and abstract ideas.'" *Bilski II*, 130 S. Ct. at 3225 (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980) ("*Chakrabarty*")). Although absent from the text of § 101, "these exceptions are . . . consistent with the notion that a patentable process must be 'new and useful.'" *Id*. The Court has construed § 101 and its predecessors in this manner for 150 years. *See Alice Corp. Pty. Ltd. v. CLS Bank Internt'l*, 573 U.S. ___ (2014) (slip op., at 5).

As the Court recently made clear, "the concern that drives this exclusionary principle [i]s one of pre-emption." *Id.*; *see also Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294 (2012) (process not patent-eligible because "upholding the patents would risk disproportionately tying up the use of the underlying natural laws, inhibiting their use in the making of further discoveries"); *Bilski II*, 130 S. Ct. at 3231 (concept not patent-eligible because allowing patent "would pre-empt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea"). "Phenomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work," *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972) ("*Benson*"); and "monopolization of those tools through the grant of a patent might tend to impede innovation

more than it would tend to promote it," thereby undermining the Patent Act's purpose, *Mayo*,

132 S. Ct. at 1293; *accord Alice*, 573 U.S. at ___ (slip op., at 6).  As the Court explained in

*Chakrabarty*:

> [A] new mineral discovered in the earth or a new plant found in the wild is not
> patentable subject matter.  Likewise, Einstein could not patent his celebrated law
> that $E = mc^2$; nor could Newton have patented the law of gravity.  Such discoveries
> are manifestations of . . . nature, free to all men and reserved exclusively to none.

447 U.S. at 309 (internal quotation marks and citation omitted) (second alteration in

*Chakrabarty*).

On the other hand, the Court has also cautioned against too broadly interpreting the § 101

exceptions, "[f]or all inventions at some level embody, use, reflect, rest upon, or apply laws of

nature, natural phenomena, or abstract ideas."  *Mayo*, 132 S. Ct. at 1293; *see id.* ("The Court has

recognized . . . that too broad an interpretation of this exclusionary principle could eviscerate

patent law."); *see also Alice*, 573 U.S. at ___ (slip op., at 6) ("[W]e tread carefully in construing

this exclusionary principle lest it swallow all of patent law.").  Although laws of nature, natural

phenomena, and abstract ideas are themselves not patentable, the Court has made clear that

"'[a]pplications' of such concepts 'to a new and useful end' . . . remain eligible for patent

protection."  *Alice*, 573 U.S. at ___ (slip op., at 6) (quoting *Benson*, 409 U.S. at 67) (other

brackets omitted).  Accordingly, in applying the § 101 exceptions, courts "must distinguish

between patents that claim the building blocks of human ingenuity and those that integrate the

building blocks into something more, . . . thereby transforming them into a patent-eligible

invention."  *Id.* (internal quotation marks, citations, and brackets omitted).

"Courts have had some difficulty defining with precision the line between an

impermissibly abstract idea and a patentable process."  *Lumen View*, 984 F. Supp. 2d at 195; *see*

*also Parker v. Flook*, 437 U.S. 584, 589 (1978) ("*Flook*") ("The line between a patentable

'process' and an unpatentable 'principle' is not always clear.").  In two recent cases, however—
*Mayo Collaborative Services v. Prometheus Laboratories, Inc.* and, particularly, *Alice Corporation Pty. Ltd. v. CLS Bank International*, decided last month—the Supreme Court clarified the framework courts are to use "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts."[3]  *Alice*, 573 U.S. at ___ (slip op., at 7).

Before setting out that framework and applying it to the '516 Patent, it is first useful to review the line of Supreme Court cases leading up to and including *Alice*, because these cases give context to the two recent decisions, and provide guidance in differentiating between eligible and ineligible patents.

### B.      The Supreme Court's Jurisprudence as to Unpatentable Abstract Ideas

In *Gottschalk v. Benson*, 409 U.S. 63 (1972), the Court invalidated a patent application for a method for programming a general-purpose computer to convert binary-coded decimal ("BCD") numerals into pure binary code, on the ground that it claimed nothing more than a patent-ineligible scientific truth or law of nature rather than a patentable process.  *Id.* at 64, 72–73.  The Court noted that a "novel and useful structure created with the aid of knowledge of scientific truth" could be patent-eligible.  *Id.* at 67 (internal quotation marks and citation omitted).  However, the Court determined, the patent before it claimed nothing more than a mathematical formula implemented on a generic computer, and thus was invalid under § 101.  *See id.* at 68.  The Court reasoned that the claims were "so abstract and sweeping as to cover

---

[3] Although Bravo's summary judgment motions were briefed and argued before the Court's decision in *Alice*, each party submitted a letter outlining its views as to the decision's impact on the § 101 analysis here.  *See* Dkt. 146 ("DietGoal *Alice* Letter"); Dkt. 147 ("Bravo *Alice* Letter"). Both parties agreed that the *Mayo/Alice* test is the appropriate framework for analyzing patent eligibility under § 101. The Court considered those helpful letters in reaching its decision.

both known and unknown uses of the BCD to pure binary conversion"; allowing the patent "would wholly pre-empt the mathematical formula and in practical effect would be a patent on the algorithm itself." *Id.* at 68–69, 72. Moreover, "[t]he mathematical formula involved here has no substantial practical application except in connection with a digital computer." *Id.* at 71. This, the Court explained, would be tantamount to a patent on an idea itself, and could not be maintained under the Patent Act. *See id.* at 71–72.

Shortly thereafter, in *Parker v. Flook*, 437 U.S. 584 (1978), the Court considered a patent claiming a method for updating "alarm limits" for operating conditions during the catalytic conversion process, such as temperature, pressure, and flow rates. *Id.* at 585. Applying *Benson*, the Court held that the claimed process was directed at a non-patentable mathematical formula. The Court explained that "[t]he only difference between the conventional methods of changing alarm limits and that described in [the] application . . . [is] the mathematical algorithm or formula." *Id.* at 586–87. Thus, "the claims did not describe a discovery that was eligible for patent protection." *Id.* at 587; *see also id.* at 594–95 ("Here it is absolutely clear that respondent's application contains no claim of patentable invention. . . . Respondent's application simply provides a new and presumably better method for calculating alarm limit values."). In so holding, the Court rejected the petitioner's argument "that the presence of specific 'post-solution' activity—the adjustment of the alarm limit to the figure computed according to the formula—distinguishes this case from *Benson* and makes his process patentable." *Id.* at 590. The Court reasoned that "post-solution activity, no matter how conventional or obvious in itself, can[not] transform an unpatentable principle into a patentable process." *Id.* To be patentable, "[t]he process itself, not merely the mathematical algorithm, must be new and useful." *Id.* at 591.

Then, in *Diamond v. Diehr*, 450 U.S. 175 (1981), the Court applied *Benson* and *Flook* to uphold a patent claiming a "process for curing synthetic rubber which includes in several of its steps the use of a mathematical formula and a programmed digital computer." *Id.* at 177. Although, like the patents invalidated in *Benson* and *Flook*, the patent application in *Diehr* involved a well-known mathematical formula (the Arrhenius equation), the Court reasoned that, unlike in *Benson* and *Flook*, the claims in the *Diehr* patent "do not seek to pre-empt the use of that equation. Rather, they seek only to foreclose from others the use of that equation in conjunction with all of the other steps in their claimed process," such as "installing rubber in a press, closing the mold, constantly determining the temperature of the mold, constantly recalculating the appropriate cure time through the use of the formula and a digital computer, and automatically opening the press at the proper time." *Id.* at 187. These additional steps rendered the claims patentable as "an *application* of a law of nature or mathematical formula to a known structure or process." *Id.* at 187–88. Although "Arrhenius' equation is not patentable in isolation," the Court explained, "when a process for curing rubber is devised which incorporates in it a more efficient solution of the equation, that process is at the very least not barred at the threshold by § 101." *Id.* at 187–88. The Court summarized its holdings as follows:

> A mathematical formula as such is not accorded the protection of our patent laws, *Gottschalk v. Benson*, 409 U.S. 63, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972), and this principle cannot be circumvented by attempting to limit the use of the formula to a particular technological environment. *Parker v. Flook*, 437 U.S. 584, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978). Similarly, insignificant post-solution activity will not transform an unpatentable principle into a patentable process. *Ibid.* To hold otherwise would allow a competent draftsman to evade the recognized limitations on the type of subject matter eligible for patent protection. On the other hand, when a claim containing a mathematical formula implements or applies that formula in a structure or process which, when considered as a whole, is performing a function which the patent laws were designed to protect (*e.g.*, transforming or reducing an article to a different state or thing), then the claim satisfies the requirements of § 101.

12

*Id.* at 191–92 (footnotes omitted).

In *Bilski v. Kappos*, decided in 2010, the Court reaffirmed the scope of the § 101 exceptions, as illuminated by its precedents. At issue in *Bilski* was a patent that claimed "the concept of hedging risk and the application of that concept to energy markets." *Bilski II*, 130 S. Ct. at 3229. An *en banc* panel of the Federal Circuit—which produced five splintered opinions in the case—had ruled that the claimed process was patent-ineligible because it failed the so-called "machine-or-transformation test,"[4] which that court characterized as the "'sole test governing § 101 analyses,'" and thus the definitive "'test for determining patent eligibility of a process under § 101.'" *Id.* at 3224 (quoting *Bilski I*, 545 F.3d at 955). The Supreme Court affirmed the Federal Circuit's bottom-line result, but rejected the court's imposition of a definitive test for determining the patentability of a process under § 101, on the ground that such a test imposed an atextual and unwarranted limitation on the Patent Act. *See id.* at 3226–27. The Court held instead that the scope of a patent-eligible "process" under § 101 could be found by "pointing to the definition of that term provided in § 100(b) and looking to the guideposts in *Benson*, *Flook*, and *Diehr*." *Id.* at 3231.

Analyzing those precedents and applying them to the claimed process at issue, the *Bilski* Court held that "[t]he concept of hedging, described in claim 1 and reduced to a mathematical formula in claim 4, is an unpatentable abstract idea, just like the algorithms at issue in *Benson* and *Flook*. Allowing petitioners to patent risk hedging would pre-empt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea." *Id.* at 3231. The remaining claims, moreover, are merely "broad examples of how hedging can be used in

---

[4] The Federal Circuit described the machine-or-transformation test as follows: "A claimed process is surely patent-eligible under § 101 if: (1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." *Bilski I*, 545 F.3d at 954.

13

commodities and energy markets," and "*Flook* established that limiting an abstract idea to one field of use or adding token postsolution components did not make the concept patentable." *Id.* Accordingly, the Court held that the claimed process was ineligible for patent protection.

Two years later, in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289 (2012), the Court drew a line between patent-ineligible concepts and patent-eligible applications of those concepts. At issue in *Mayo* were "patent claims covering processes that help doctors who use thiopurine drugs to treat patients with autoimmune diseases determine whether a given dosage level is too low or too high. The claims purport[ed] to apply natural laws describing the relationships between the concentration in the blood of certain thiopurine metabolites and the likelihood that the drug dosage will be ineffective or induce harmful side-effects." *Id.* at 1294. Drawing on *Benson*, *Flook*, *Diehr*, and *Bilski*, the *Mayo* Court reaffirmed that "a process is not unpatentable simply because it contains a law of nature or a mathematical algorithm." *Id.* at 1293 (internal quotation marks and citations omitted). The Court explained that although a law of nature or mathematical formula itself is not patent-eligible, "'an *application* of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection.'" *Id.* (quoting *Diehr*, 450 U.S. at 187). However, the Court emphasized, "to transform an unpatentable law of nature into a patent-eligible *application* of such a law, one must do more than simply state the law of nature while adding the words 'apply it.'" *Id.* at 1294.

The Court then set out a two-part framework for distinguishing between patent-ineligible concepts (*i.e.*, laws of nature, natural phenomena, and abstract ideas) and patent-eligible applications of those concepts: First, a court must determine whether the claims are directed toward laws of nature, natural phenomena, or abstract ideas. If so, the court must ask if there is

something else in the claims—an "inventive concept"—"sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* at 1294. Applying that framework, the Court determined at step one that the claimed process was the equivalent of a law of nature, "namely, relationships between concentrations of certain metabolites in the blood and the likelihood that a dosage of a thiopurine drug will prove ineffective or cause harm." *Id.* at 1296. Moreover, the Court reasoned, "upholding the patents would risk disproportionately tying up the use of the underlying natural laws, inhibiting their use in the making of further discoveries." *Id.* at 1294. Accordingly, the Court held that the patent was directed to a patent-ineligible concept. Proceeding to step two, the Court held that the combination of steps recited in the patent application was not enough to render the claimed process a novel *application* of the law of nature. It reasoned that "the steps in the claimed processes (apart from the natural laws themselves) involve well-understood, routine, conventional activity previously engaged in by researchers in the field," *id.*, and "simply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable," *id.* at 1300. Accordingly, the Court held that the claimed process was patent-ineligible.

Most recently, in *Alice Corporation Pty. Ltd. v. CLS Bank International*, 573 U.S. ___ (2014), the Court considered a patent claiming "a method of exchanging financial obligations between two parties using a third-party intermediary to mitigate settlement risk," in which "[t]he intermediary creates and updates 'shadow' records to reflect the value of each party's actual accounts held at 'exchange institutions,' thereby permitting only those transactions for which the parties have sufficient resources." *Id.* at ___ (slip op., at 9). To determine whether the patent claimed a patent-eligible process, the Court applied the two-step framework articulated in *Mayo*.

At step one, the Court held that "[i]t follows from our prior cases, and *Bilski* in particular, that the claims at issue here are directed to an abstract idea." *Id.* The Court explained that "[l]ike the risk hedging in *Bilski*, the concept of intermediated settlement is 'a fundamental economic practice long prevalent in our system of commerce'" and "[t]he use of a third-party intermediary . . . is also a building block of the modern economy"; "[t]hus, intermediated settlement, like hedging, is an 'abstract idea' beyond the scope of § 101." *Id.* In so holding, the Court emphasized that to constitute an "abstract idea" under its jurisprudence, a claim need not be addressed to a "preexisting, fundamental truth," such as a law of nature or mathematical formula; as in *Bilski*, a "method of organizing human activity" may be impermissibly abstract if it is grounded in a fundamental practice. *Id.* at ___ (slip op., at 10). Turning to the second step in the *Mayo* framework, the Court held that "the method claims, which merely require generic computer implementation, fail to transform that abstract idea into a patent-eligible invention." *Id.* In so holding, the Court emphasized that "[t]he introduction of a computer into the claims does not alter the analysis at *Mayo* step two." *Id.* at ___ (slip op., at 11).

## C. Applying the *Mayo/Alice* Framework to the '516 Patent

Bravo argues that the claims of the '516 Patent fall outside § 101 because they are drawn to the abstract idea or mental concept of meal planning to meet a person's nutritional goals.[5]

---

[5] DietGoal argues that the '516 Patent claims a patentable "machine" within the meaning of § 101 because its invention is "computer-implemented" and "a computer is, without question, a machine." DietGoal § 101 Br. 12–13. However, the '516 Patent does not claim a computer, or a machine of any type, as its invention. Rather, the independent claims of the '516 Patent recite a "system" and a "method" of computerized meal planning, which is to be implemented on an *existing* general purpose computer. These claims clearly contemplate a process, not a machine. *See* 35 U.S.C. § 100 (the term "process" within the meaning of the Patent Act "means a process, art or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material"); *see also Lumen View*, 984 F. Supp. 2d at 194 (holding that patent's claimed "method for facilitating evaluation" for the purpose of matchmaking "plainly is a process"). Accordingly, the Court treats the '516 Patent as asserting process claims. In any

DietGoal argues that the limitations on the claims—namely, the display functionality required by the "Picture Menus" and "Meal Builder" elements—are sufficient to restrict the scope of the claims to a patent-eligible application. In determining whether the '516 Patent in fact claims a patent-ineligible abstract idea or a patent-eligible application of that idea, the Court applies the two-step framework articulated by the Supreme Court in *Mayo* and reaffirmed in *Alice*, guided by the Court's abstract idea jurisprudence dating back to *Benson*.

### 1. Are the claims directed toward a patent-ineligible concept?

First, the Court must determine whether the claims of the '516 Patent are directed toward a patent-ineligible concept. *See Alice*, 573 U.S. at ___ (slip op., at 7).

Using the Supreme Court's precedents on patent-eligibility as "guideposts," it is clear that the claims of the '516 Patent are directed to an impermissible abstract idea or mental concept.[6] The '516 Patent claims a process for computerized meal planning; in essence, it

---

event "[r]egardless of what statutory category ('process, machine, manufacture, or composition of matter,' 35 U.S.C. § 101) a claim's language is crafted to literally invoke, we look to the underlying invention for patent-eligibility purposes." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1374 (Fed. Cir. 2011) (holding that, regardless of form, claim directed to a "computer readable medium" should be treated the same as parallel process claims for the purposes of the § 101 analysis). For the reasons discussed at length below, the system and method claims of the '516 Patent—regardless of whether characterized as a "process" or "machine"—are drawn to patent-ineligible subject matter under § 101.

[6] The Federal Circuit treats "mental processes" as a subcategory of "abstract ideas." *See, e.g.*, *CyberSource*, 654 F.3d at 1371 (invalidating patent on ground that it claimed an "unpatentable mental process—a subcategory of unpatentable abstract ideas"). The Supreme Court, on the other hand, has sometimes identified "mental processes" as its own distinct category of unpatentable subject matter. *Compare Gottschalk*, 409 U.S. at 67 ("Phenomena of nature, though just discovered, *mental processes*, and abstract intellectual concepts are not patentable . . . .") (emphasis added); *Mayo*, 132 S. Ct. at 1293 (same); *with Diehr*, 450 U.S. at 185 ("Excluded from such patent protection are laws of nature, natural phenomena, and abstract ideas."); *Bilski II*, 130 S. Ct. at 3225 (same). Because the '516 Patent is invalid under either formulation, the Court need not decide whether mental processes constitutes its own class of patent-ineligible subject matter.

17

recites a computer program that allows the user to create meals from a database of food objects according to his or her preferences and dietary goals, to change those meals by adding or subtracting food objects, and to view the dietary impact of changes to those meals on a visual display. DietGoal attempts to dress up the claims as a computerized process for "behavior analysis" and "training." But the claims of the '516 Patent recite nothing more than the abstract concept of selecting meals for the day, according to one's particular dietary goals and food preferences. Meal-planning is surely a "long prevalent" practice, *Bilski II*, 130 S. Ct. at 3231 (internal quotation marks omitted). It is, by any reckoning, at least as longstanding as the economic practices of risk-hedging (invalidated in *Bilski*) and intermediated settlement (invalidated in *Alice*). If anything, it is more venerable: Although specific approaches to meal-planning have evolved as dietary knowledge has advanced and social mores have changed, humans have assuredly engaged at least in rudimentary meal-planning "for millennia." *Lumen View*, 984 F. Supp. 2d at 200 (finding relevant, in invalidating patent claiming computerized method for facilitating matchmaking, that the claimed process was nothing more than mathematical manifestation of a fundamental process, which matchmakers had been doing "all through human history"). Sustaining DietGoal's patent would thus "effectively grant a monopoly over an abstract idea." *Bilski II*, 130 S. Ct. at 3231.

Moreover, like the claims invalidated in *Benson* and *Flook*, the claims of the '516 Patent recite steps that, although computer-implemented by virtue of the patent application, could "be performed in the human mind, or by a human using a pen and paper," and "a method that can be performed by human thought alone is merely an abstract idea and is not patent-eligible under § 101." *Cybersource*, 654 F.3d at 1372, 1373. In *Benson*, the Court held that the computerized method claimed in the patent for converting BCD numerals into pure binary code was directed

18

toward an impermissible abstract idea, in part because "[t]he conversion of BCD numerals to pure binary numerals can be done mentally."  409 U.S. at 66, 67.  Similarly, in *Flook*, the Court held that a well-known method for calculating alarm limits could be done using "pencil and paper," and thus the patent claiming computerized application of that method was outside the scope of § 101.  437 U.S. at 586.

Here, the '516 Patent claims a computerized method of selecting meals that align with the user's individual preferences and nutritional goals (for example, by planning out dinners for the week that accord with a low-calorie diet) and calculating the dietary impact of the addition or subtraction of certain foods (for example, by determining how many calories you will save by swapping out French fries for broccoli).  These are conventional and quotidian tasks.  A person can perform them without the aid of any particular or structured method and without the need of any technology.  Indeed, dieters planning their meals and calculating their daily caloric intake make such determinations regularly, whether acting systematically or intuitively.  So too do parents planning meals for their children, so as to meet health or nutritional goals.  The '516 Patent does not recite any specialized formula or method for implementing the "well known" process of meal planning; at most, it merely "provides a new and presumably better method" for calculating and visualizing the dietary impact of certain food choices.  *Flook*, 437 U.S. at 594. This is not the kind of "discover[y]" that § 101 was designed to protect.  *Id.* at 593; *see, e.g.*, *Cybersource*, 654 F.3d at 1373 (computerized method for collecting and organizing credit card transaction data invalid under § 101 because claimed method "can be performed by human thought alone").

19

### 2. Are there additional elements sufficient to transform the nature of the claim?

Having determined that the method claims at issue are directed at an abstract idea, the Court next considers whether the claims or elements of the claim contain an "inventive concept" capable of transforming the abstract idea into a patent-eligible application of that idea. *See Alice*, 573 U.S. at ___ (slip op., at 11).

DietGoal principally contends that the computer-implementation of the steps of the '516 Patent—specifically, the computerized process by which users can create meals using the Picture Menus and view the nutritional impact of changes to those meals using the Meal Builder—renders its claims patentable. *See* DietGoal § 101 Br. at 16 ("The fact that all of the claims of the '516 Patent require computerization refutes Bravo's assertion that the claims are not patent eligible because they claim only a mental process."); *see also* DietGoal *Alice* Letter at 4 ("The 'Picture Menus' limitation is central to the invention's objective of providing visual techniques for training individuals to modify dietary behavior. . . . [T]he 'Me[al] Builder' limitation is central to the invention's objective to train people to understand and immediately recognize the significance of the impact of customized meals on dietary goals.") (emphasis omitted).

The Supreme Court's abstract-ideas jurisprudence, including the recent decision in *Alice*, however, rejects the idea that "the mere recitation of a generic computer can[] transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 573 U.S. at ___ (slip op., at 13). As the Court has explained, the abstract-ideas exception to § 101 "cannot be circumvented by attempting to limit the use of the [idea] to a particular technological environment." *Diehr*, 450 U.S. at 191. And an unpatentable concept cannot be transformed into a patent-eligible application simply by stating the abstract idea and "adding the words 'apply it.'" *Alice*, 573 U.S. at ___ (slip op., at 13) (quoting *Mayo*, 132 S. Ct. at 1294). Instead, there must be

20

"additional features" that "provide practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself." *Mayo*, 132 S. Ct. at 1297. As the Court has further explained, "[g]iven the ubiquity of computers, . . . wholly generic computer implementation is not generally the sort of 'additional featur[e]'" that can provide such "'practical assurance.'" *Alice*, 573 U.S. at ___ (slip op., at 13) (quoting *Mayo*, 132 S. Ct. at 1297) (second alteration in *Alice*); *see also SmartGene, Inc. v. Advanced Biological Labs., SA*, 55 F. App'x 950, 954 (Fed. Cir. 2014) ("[S]ection 101 covers neither 'mental processes'— associated with or as part of a category of 'abstract ideas'—nor processes that merely invoke a computer and its basic functionality for implementing such mental processes, without specifying even arguably new physical components or specifying processes defined other than by the mentally performable steps."); *CyberSource*, 654 F.3d at 1375 ("[T]he basic character of a process claim drawn to an abstract idea is not changed by claiming only its performance by computers, or by claiming the process embodied in program instructions on a computer readable medium.").

*Alice*, in fact, disposes of DietGoal's argument. There, the petitioner argued that its claims to a method for mitigating settlement risk were patent-eligible because each step required computer implementation. The Supreme Court squarely rejected that argument. *See* 573 U.S. at ___ (slip op., at 11) ("The introduction of a computer into the claims does not alter the analysis at *Mayo* step two."). At step two of the *Mayo* analysis, the Court explained, "the relevant question is whether the claims . . . do more than simply instruct the practitioner to implement the abstract idea of intermediated settlement on a generic computer." *Id.* at ___ (slip op., at 14). The representative method claim at issue in *Alice* recited the following steps:

> (1) "creating" shadow records for each counterparty to a transaction; (2) "obtaining" start-of-day balances based on the parties' real-world accounts at

21

> exchange institutions; (3) "adjusting" the shadow records as transactions are entered, allowing only those transactions for which the parties have sufficient resources; and (4) issuing irrevocable end-of-day instructions to the exchange institutions to carry out the permitted transactions.

*Id.* Analyzing each element of the method claim separately, the Court held that "the function performed by the computer at each step of the process is '[p]urely conventional,'" and thus could not qualify as an "inventive concept." *Id.* at \_\_\_ (slip op., at 15) (quoting *Mayo*, 132 S. Ct. at 1299). The Court explained that using a computer "to create and maintain 'shadow accounts'" is commensurate with "electronic recordkeeping—one of the most basic functions of a computer"; likewise "use of a computer to obtain data, adjust account balances, and issue automated instructions" amounts to "'well-understood, routine, conventional activit[ies]' previously known to the industry." *Id.* (quoting *Mayo*, 132 S. Ct. at 1299) (brackets in *Alice*). Accordingly, "each step does no more than require a generic computer to perform generic computer functions." *Id.* The Court then considered the computerized steps as an "ordered combination," and held that considering the claims as a whole "'add[s] nothing . . . that is not already present when the steps are considered separately.'" *Id.* (quoting *Mayo*, 132 S. Ct. at 1298) (second alteration in *Alice*) (other brackets omitted); *see also id.* ("Viewed as a whole, petitioner's method claims simply recite the concept of intermediated settlement as performed by a generic computer."). "Under our precedents," the Court explained, "that is not 'enough' to transform an abstract idea into a patent-eligible invention." *Id.* at \_\_\_ (slip op., at 15, 16) (citation and emphasis omitted).

The pre-*Alice* decision from this District in *Lumen View Tech. v. Findthebest.com, Inc.* (Cote, J.), on which the briefs of the parties here focused, anticipated this outcome. It reached the conclusion that the patent at issue was not made eligible by the addition of an all-purpose computer. Because the facts there closely parallel those here, and because the Court finds the reasoning in *Lumen View* persuasive, the Court reviews the *Lumen View* decision here.

22

At issue in *Lumen View* was a patent that claimed a "method of matchmaking whereby one or more parties on each side input attribute preferences and intensity of preference data and then a computer matches the parties on each side by a 'closeness-of-fit' process and produces a list" (the '073 patent). *Lumen View*, 984 F. Supp. 2d at 192. Judge Cote there held that, under *Benson*, *Flook*, *Diehr*, and *Bilski*, the addition of a general-purpose computer is insufficient to transform a patent-ineligible abstract idea into a patent-eligible application of that concept. *See id.* at 200. Specifically, after determining that the claim was directed toward the abstract idea of matchmaking, Judge Cote considered whether the '073 patent contained an "inventive idea," and determined that it did not. She found that the method articulated in the patent was "merely a mathematical manifestation of the underlying process behind matchmaking: determining good matches"; in other words, "the computerization of a fundamental process that has occurred all through human history." *Id.* She found relevant that "the '073 patent does not disclose a specific *method* of using a computer to execute the abstract idea of matchmaking, it only claims the abstract concept of computerized matchmaking in a business or enterprise context." *Id.* Moreover, the computer does not "'facilitat[e] the process in a way that a person making calculations or computations could not.'" *Id.* (quoting *Bancorp Servs. L.L.C. v. Sun Life Assur. Co. of Canada (U.S.), L.L.C.*, 687 F.3d 1266, 1278 (Fed. Cir. 2012)). Accordingly, she held, the use of a computer did not provide a meaningful limitation on the abstract idea of matchmaking.

Having found the independent claim of the '073 (Claim 1) invalid, Judge Cote next examined the dependent claims, which relied on the computerized matchmaking process recited in Claim 1, and held that they too were invalid: "[N]one of the limitations materially limit Claim 1 such that they could survive independently even if Claim 1 were not invalidated"; they merely add "well-known . . . analysis techniques" to the abstract idea of matchmaking. *Id.* at 203

(alteration in original) (brackets omitted). Accordingly, the court held that the patent was invalid under §101.

The reasoning of *Alice* and *Lumen View* is dispositive here. The claims of the '516 Patent do no more than "simply instruct the practitioner to implement the abstract idea . . . on a generic computer"; they thus do not contain the requisite "inventive concept" necessary to limit the scope of the claims to a patent-eligible application. *Alice*, 573 U.S. at ___ (slip op., at 14). The Patent's method claims recite the following steps: (1) preparing a database of meals that meet the user's preferences; (2) choosing meals for a particular day from the Picture Menus; and (3) deciding whether or not to change one or more of the meals that the user has selected for that day, and, using the Meal Builder, allowing the user to visualize those changes and the resulting impact on his or her nutritional goals. Considering each element of the method claim separately, "the function performed by the computer at each step . . . is '[p]urely conventional.'" *Id.* at ___ (slip op., at 15) (quoting *Mayo*, 132 S. Ct. at 1299). Steps 1 and 2 involve creating customized lists by retrieving information from a stored database—one of the most basic functions of the generic computer. *See, e.g.*, *SmartGene*, 555 F. App'x at 954 (computerized claims that do "no more than call on a 'computing device,' with basic functionality for comparing stored and input data and rules, to do what doctors do routinely" not patent eligible). Step 3 likewise amounts to conventional computer tasks: manipulating data based on inputs from the user, making computations from stored data, and displaying the results on a visual display. *See Accenture Global Services, GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1338, 1344–45 (Fed. Cir. 2013) (computerized aspects of method claim directed to "generating tasks to be performed in an insurance organization," including a "data component that stores, retrieves and manipulates data"

24

and a client component that "transmits and receives data to/from the data component," insufficient to transform abstract idea into concrete application of that idea).

Although DietGoal contends that the display functionality is "highly particularized," DietGoal Alice Letter at 2, the claimed process could "be carried out in existing computers long in use, no new machinery being necessary," *Benson*, 409 U.S. at 67. Indeed, the steps required by the '516 Patent—preparing lists of food items, creating meals from those lists of food items, using known nutritional information to calculate the dietary impact of changes to those meals, and visually displaying the results—are far more "routine" and "conventional" than the computerized applications of the economic concepts invalidated in *Bilski* and *Alice*. These computerized elements, taken separately, do nothing to "transform" the nature of the claim from the mental process of meal planning into a novel method or unique application of that idea, and thus are insufficient to render the claims of the '516 Patent patent-eligible.

The outcome is no different when one considers the claims "as an ordered combination." That is because the claims of the '516 Patent, viewed as a whole, recite nothing more than "the concept of [meal planning] as performed by a generic computer." *Alice*, 573 U.S. at ___ (slip op., at 15). The Patent specifies that the user can choose preset meals and food items from the Databases, see those meals displayed using the Picture Menus, and change those meals on the Meal Builder, as well as visualize the impact of those changes. These steps, however, are insufficient to transform the abstract idea of meal planning into a patentable process. *See Mayo*, 132 S. Ct. at 1300 ("[S]imply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable."). The addition of a computer to perform calculations, retrieve data, and visually display images is nothing more than "post-solution activity" that

cannot render the process patentable.  *Flook*, 437 U.S. at 590.  In sum, the addition of the

computer here is not "'sufficient to ensure that the patent in practice amounts to significantly

more than a patent upon the [ineligible concept] itself.'"  *Alice*, 573 U.S. at ___ (slip op., at 7)

(quoting *Mayo*, 132 S. Ct. at 1294) (alteration in *Alice*).  Accordingly, the '516 Patent does not

recite a patent-eligible invention.

### 3.  The system and method claims are functionally equivalent

Having determined that the method claims recite a patent-ineligible abstract idea or

mental concept, the Court next assesses the system claims.

The system claims of the '516 Patent (Claims 1 and 2) recite a system consisting of a

User Interface; a Database of food objects "organizable into meals"; at least one Picture Menu,

"which displays on the User Interface meals from the Database that a user can select from to

meet customized eating goal"; and a Meal Builder, "which displays on the User Interface meals

from the Database, and wherein a user can change content of said meals and view the resulting

meals' impact on customized eating goals."  Comparing the language of the system claims with

that of the method claims, it is clear that these are functionally identical:  "The only difference

between the claims is the form in which they were drafted."  *Bancorp Servs.*, 687 F.3d at 1277.

Thus, they must be treated as equivalent for purposes of the § 101 analysis.  *See id.* (affirming

decision to treat similarly-worded system and method claims at issue as equivalent in the § 101

analysis); *cf. Diehr*, 450 U.S. 1057–58 ("In determining the eligibility of respondent's claimed

process for patent protection under § 101, their claims must be considered as a whole."); *Flook*,

437 U.S. at 593 (rejecting argument for patentability that "would make the determination of

patentable subject matter depend simply on the draftsman's art").

Taken in isolation, the system claims "add nothing of substance to the underlying abstract idea" of meal planning. *Alice*, 573 U.S. at ___ (slip op., at 17). They merely describe generic computer components that can be found on any general-purpose computer, such as a user interface, database, or visual display. Even taken together with the limitations contained in the dependent claims, the system claims recite nothing more than "a handful of generic computer components configured to implement the same [abstract] idea" as the patent-ineligible method claims. *Id.* at ___ (slip op., at 16). Thus, the system claims are likewise patent ineligible under §101. *See id.* at ___ (slip op., at 16, 17) ("the system claims are no different from the method claims in substance," and thus "they too are patent ineligible under § 101").

### 4. Claim construction is not required

At argument, DietGoal contended that it would be improper for the Court to decide whether the '516 Patent is drawn to patent-eligible subject matter without first performing claim construction. In essence, DietGoal requests that the Court refrain from deciding the validity of the '516 Patent until after it has performed claim construction.

Claim construction, however, "is not an inviolable prerequisite to a validity determination under § 101." *Bancorp. Servs.*, 687 F.3d at 1273; *see, e.g.*, *Bilski II*, 130 S. Ct. at 3231 (finding subject matter ineligible for patent protection without claim construction). Indeed in *Lumen View*, the court squarely rejected plaintiff's contention that claim construction is necessary before addressing the § 101 inquiry. *See* 984 F. Supp. 2d at 205. The court explained that "[w]hile claim construction may sometimes be helpful in resolving a Section 101 motion where detailed explication of the claims in a patent would reveal material legal issues," it is not required in every case. *Id*. With respect to the patent before it, the court determined that claim construction was unnecessary, reasoning that the patent's claims are "straightforward" and that

27

"[n]o components are opaque such that claim construction would be necessary to flush out its contours." *Id.* Moreover, the court determined that the § 101 inquiry with respect to those claims "encompasses only broad subject matter categories," and thus "claim construction is not necessary to reveal any material legal issues." *Id.* (internal quotation marks and citations omitted). Accordingly, the court determined that claim construction would not be a wise use of judicial resources. *See id.*

As in *Lumen View*, the claims of the '516 Patent are sufficiently "straightforward" that formal claim construction is not necessary to understand their content. *Id.* Nor would claim construction shed light on any dispositive legal issue; the computerized process disclosed in the '516 Patent is invalid under § 101, under any reasonable construction. Claim construction would not assist the Court in resolving the § 101 claim of invalidity.

In any event, even assuming the construction urged by DietGoal—the one articulated by the Eastern District of Texas in the parallel case *DietGoal Innovations LLC v. Kellan Restaurant Management Corp.*, No. 12 Civ. 761 (JRG) (RSP), 2014 WL 582994 (E.D. Tex. Feb. 13, 2014) ("*Kellan*"), *see, e.g.*, DietGoal § 101 Br. 5–6[7]—the subject matter claimed in the '516 Patent is still impermissibly abstract. In its claim construction ruling, the *Kellan* court held, *inter alia*, that all claims of the '516 Patent required the claimed system or method to be "computerized" or "computer implemented"; it found that "[t]he preamble use of 'computerize' [in each independent claim] gives the necessary life and meaning to these other claim terms that are indicative of a computerized system." *Id*. at \*5. For the reasons discussed above, however, the

---

[7] On June 30, 2014, a court in this District adopted a claim construction substantially similar to that adopted in *Kellan*. *See DietGoal Innovations LLC v. Time, Inc.*, 13 Civ. 8381 (JSR), 2014 WL 2990237 (S.D.N.Y. June 30, 2014) ("*DietGoal v. Time*"). The court in *DietGoal v. Time*, however, was not presented with a challenge to the validity of the '516 Patent under § 101.

computerized nature of the process does not save the '516 Patent from invalidity. Nothing in the *Kellan* court's claim construction alters, or is at odds with, the fact that the method recited in the '516 Patent can be performed by a human using pen and paper; application of the process to a generic computer does not add any meaningful limitation.

In arguing to the contrary, DietGoal seizes on a line from the *Kellan* court's ruling: "'There is no indication in the specification of the eating goals being merely a mental process.'" DietGoal § 101 Br. 5–6 (quoting *Kellan*, 2014 WL 582994, at \*10). But this isolated language does not bear the freight that DietGoal assigns it. It does not reflect a determination by the *Kellan* court at odds with this Court's § 101 analysis. Notably, the *Kellan* court went on to state that "what is described as a 'customized' goal in the context of the intrinsic record as a whole is a *goal that is computer implemented[,] not merely a user's personal mental objective*." 2014 WL 582994, at \*10 (emphasis added). The *Kellan* court thus, like this Court, read the process recited in the '516 Patent as merely allowing the user to implement his or her personalized dietary priorities on a computer, as opposed to having to do so mentally. That understanding does not alter—indeed it is fully consistent with—the foregoing § 101 analysis. Nor would the construction of any of the terms offered by DietGoal in its Joint Claim Construction submission alter that analysis. *See* Dkt. 144 Ex. 1. Thus, under any reasonable construction, including DietGoal's preferred construction, the claims of the '516 Patent are drawn to patent-ineligible subject matter. Accordingly, the '516 Patent is invalid under § 101.

## Conclusion

For the foregoing reasons, the '516 Patent is drawn to patent-ineligible subject matter. Bravo's motion for summary judgment is granted. The Clerk is directed to terminate all pending motions, and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: July 8, 2014
New York, New York